**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **GREGORY DAVIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 14 C 1260** |
| | ) | |
| **v.** | ) | **Magistrate Judge Mason** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge:

Claimant Gregory Davis ("Davis" or "claimant") brings this motion for summary judgment seeking judicial review of the decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied Davis's claim for social security disability benefits under the Social Security Act, 42 U.S.C. §§ 416 and 423. The Commissioner filed a cross-motion for summary judgment, requesting that this Court uphold the decision of the Administrative Law Judge (the "ALJ"). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g) and 28 U.S.C. § 636(c). For the reasons set forth below, claimant's motion for summary judgment [13] is granted and the Commissioner's cross-motion for summary judgment [18] is denied.

**I.     BACKGROUND**

**A.  Procedural History**

On February 3, 2009, Davis filed an application for a period of disability and disability insurance benefits, alleging disability beginning on November 6, 2008. (R.

76.)  His date of last insured was December 31, 2010.  (R. 78.)  The claim was initially

denied on July 1, 2009, and upon reconsideration on October 14, 2009.  (R. 76.)  Davis

then filed a written request for hearing on November 21, 2009.  (*Id.*)  Davis (represented

by counsel) appeared and testified at a hearing held on November 3, 2010 before ALJ

Percival Harmon.  (*Id.*)  On March 18, 2011, the ALJ issued a decision denying Davis's

disability claim.  (R. 76-84.)  On October 26, 2011, the Appeals Council temporarily

remanded because the hypothetical question to the vocational expert did not include

certain postural and environmental limitations.  (R. 90.)  Davis was to have a new

hearing, but on May 14, 2012, the Appeals Council vacated its prior order of remand.

(R. 91, 95.)  The Appeals Council then denied the request for review on December 24,

2013.  (R. 1.)  Davis subsequently filed this action in the District Court.

### B.  Medical Evidence and Records

Claimant seeks disability insurance benefits for impairments, including

cardiomyopathy and congestive heart failure, which were the result of a pulmonary

embolism and a heart attack.  (R. 9-14.)

Advocate Christ Hospital

Much of the medical evidence in the administrative record stems from Davis's

hospital stay in November of 2008.  On November 6, 2008, Davis visited his primary

care physician, Dr. Prentiss Taylor, and complained of difficulty breathing, chest

congestion, coughing, difficultly walking, lightheadness and pain in his stomach.  (R.

387-89.)  Dr. Taylor instructed Davis to go to the Emergency Room if his symptoms

worsened.  (R. 389.)  The following day, Davis went to the Emergency Room at Christ

Hospital, complaining of "significant shortness of breath," lightheadedness and a cough.

(R. 312, 317.)  He denied having any palpitations.  (R. 322.)  The record indicates that a 2D echocardiogram revealed moderate concentric left ventricular systolic dysfunction with ejection fraction in the range of 20-25%.  (*Id.*)  It also revealed a large mobile mass attached to the right side of the interatrial septum consistent with thrombus.  (*Id.*)  The examining physician in the ER noted that further evaluation with transesophageal echocardiography was recommended.  (*Id.*)

On November 7, 2008, Davis was admitted to Christ Hospital and was examined by a cardiologist, Dr. Muhyaldeen Dia.  (R. 312-13.)  Dr. Dia found that Davis had "a pulmonary embolism and also severe left ventricular dysfunction with heart failure symptoms."  (R. 312.)  Dr. Dia noted that he was recently diagnosed with hypertension. (*Id.*)  Dr. Dia concluded that Davis had a mass in the right atrium of his heart, consistent with a clot.  (R. 313.)  He stated that Davis had suffered from heart failure and he recommended a coronary angiogram and a biopsy.  (*Id.*)

While at Christ Hospital, Davis was also examined by Dr. Rasheed Akhtar on November 7, 2008.  (R. 300.)  Dr. Akhtar noted that Davis has a history of hypertension and came to the ER because he was not feeling good.  (*Id.*)  Dr. Akhtar also noted that Davis reported dyspnea on exertion from carrying a bag of groceries.  (*Id.*)  The record also indicates that Davis had a fever, chills, and upper respiratory infection two weeks ago.  (*Id.*)  Dr. Akhtar's recommendation was to put Davis on Coumadin for his pulmonary embolism, begin home medications for his hypertension and consult with cardiology for further plans.  (R. 301.)

Dr. Lucy Ho also examined Davis on November 7, 2008.  (R. 302.)  Her assessment, like the others who examined Davis, was that he suffered from a

pulmonary embolism (including shortness of breath), hypertension, elevated myocardial infarction, congestive heart failure/cardiomyopathy, acute renal insufficiency, prophylaxis and poor nutrition.  (R. 304.)

Davis was also seen by Dr. Muhammad Hamadeh on November 8, 2008 for a pulmonary consultation.  (R. 310.)  Dr. Hamadeh noted that Davis had multiple complaints, including chest pain, shortness of breath, and a nonproductive cough.  (*Id.*)  Dr. Hamadeh also noted that Davis had an acute pulmonary emboli, a likely thrombus in the left atrium, as well as congestive heart failure and cardiomyopathy.  (R. 311.)

During his hospital stay, Davis was seen again by Dr. Dia on November 10 and 11, 2008.  (R. 328-29.)  Davis underwent a coronary angiogram, which revealed abnormal hemodynamics secondary to systemic hypertension and normal coronary artery system.  (*Id.*)  Dr. Dia stated that cardiovascular surgery was recommended to remove the right atrial clot.  (*Id.*)

Another echocardiogram was performed on November 16, 2008.  (R. 333.)  The findings after this exam included: "the left ventricular is hypertrophied and enlarged. Systolic function is moderately reduced overall.  The left atrium is enlarged.  The aortic root is normal sized, right ventrical is enlarged."  (*Id.*)  In addition, this test found "a questionable echo density…within the right atrium."  (*Id.*)  After reviewing these results, Dr. Paul Silverman concluded that Davis had "left ventricular hypertrophy with moderate systolic dysfunction, left atrial and right ventricular enlargement."  (*Id.*)

Dr. Robert Stein examined Davis on November 16, 2008, at which time Davis was alert, oriented, his vital signs were stable and he was in no distress.  (R. 306.)  Dr. Stein stated that Davis's history is significant for recent onset of shortness of breath,

which has been progressive in nature.  (R. 306.)  Dr. Stein expressed concern that the mobile thrombotic mass may pass through the patent foramen ovale and subsequently result in a stroke.  (*Id.*)  Because of this concern, Dr. Stein recommended that surgical intervention be delayed and that Davis continue on anticoagulation.  (*Id.*)  Dr. Stein discussed his concerns with Dr. Dia on November 14, 2008.  (*Id.*)  Dr. Dia expressed concerns with delaying surgery.  (*Id.*)  Dr. Stein stated that if there was a significant need to intervene he would not object to proceeding with surgery if necessary to prevent possible embolic stroke.  (R. 307.)  The record indicates Dr. Stein was to await results of Davis's follow up 2D echocardiogram as well as thrombophilia workup and Davis was to continue taking heparin at the present time.  (*Id.*)

Davis was discharged from the hospital on November 17, 2008.  (R. 367.)  Dr. Vinay Kumar stated Davis's discharge diagnosis as follows: "(1) Right atrial clot. (2) Hypertension. (3) History of venous stripping in the right side. (4) History of pulmonary embolism. (5) Cardiomyopathy. (6) Congestive heart failure. (7) Renal insufficiency." (*Id.*)  Davis was therapeutic at the time of discharge, his vitals were stable and he had been advised to follow up with his primary care physician, continue taking coumadin, and follow up with Dr. Dia as an outpatient.  (R. 367.)  Dr. Dia also examined Davis again on November 17, 2008 before he was discharged.  At that time, Dr. Dia noted "moderate to severe left ventricular dysfunction, mild mitral regurgitation, mild tricuspid regurgitation, resolved clot in the right atrium, and a patent foramen ovale with right-to-left shunt."  (R. 327.)

On November 20, 2008, Davis returned to his physician, Dr. Taylor, for a follow up appointment after his hospital stay.  (R. 392.)  Dr. Taylor noted that Davis was

feeling much better and had no specific complaints. (*Id.*) He was told to work on improving his diet. (*Id.*) He returned again on December 2, 2008 for additional follow up. (R. 399.) Dr. Taylor noted that Davis was doing well, his blood pressure was under control, he had been compliant with his medications and his dietary restrictions, and he did not complain of dyspnea. (*Id.*) It was noted that he was taking six medications daily. (*Id.*) Dr. Taylor informed Davis that he needed to work towards getting better control of his blood pressure. (*Id.*) Davis saw Dr. Taylor again on December 16, 2008 for additional follow-up and the report was much the same. (*Id.*)

On January 23, 2009, Davis had another appointment with Dr. Taylor. (R. 377.) At that time, Davis was "doing well" and did not complain of dyspnea with exertion "unless he does extensive snow shoveling." (*Id.*) He also stated no complaints of pedal edema, palpitations, syncope or presyncope. (*Id.*) At this time, Davis was still taking six medications daily and he told Dr. Taylor that "he gets out of sorts" when he takes four medications together in the morning. (*Id.*) Dr. Taylor advised him to space out his medications so that he is not taking them all at once to see if this helps with this side effect. (*Id.*)

On February 3, 2009, Davis presented to the Anti-Coagulation Clinic at Advocate Health Centers for a check on his medications. (R. 379.) At this visit, it was noted that Davis had complained to Dr. Taylor about feeling tired after taking his morning medications. (*Id.*) Davis saw Dr. Taylor again on May 29, 2009, and it was noted that he complained of dyspnea with exertion "when lifting anything of even moderate weight." (R. 491.) The report from this appointment also stated that Davis had been compliant with his medications, he had no complaints of dyspnea, chest pain, swelling

6

or pedal edema.  (*Id.*)  He had normal coronaries and his blood pressure was under good control.  (*Id.*)

On July 17, 2009, Davis had an echocardiogram.  (R. 530.)  Dr. Dia reviewed the results and concluded that the left ventricle was mildly dilated and there was moderate left ventricular hyptertrophy.  (*Id.*)  The global left ventricular systolic function was estimated to be mildly reduced, the left atrium was mildly enlarged, and there was trace tricuspid regurgitation.  (*Id.*)

In 2010, Davis continued to visit the Anti-Coagulation Clinic at Advocate Medical Group and his primary physician Dr. Taylor.  (R. 500-20.)  Throughout this time, he continued with his six daily medications.  (*Id.*)  On January 14, 2010, he reported that he was not feeling tired, had no recent chest pain or discomfort, no dizziness, lightheadness or fainting, no palpitations, no dyspnea and no intermittent leg claudication.  (R. 514.)  His weight continued to be a problem and Dr. Taylor discussed the need to improve his diet and to start walking.  (R. 516.)  Similarly, on April 29, 2010, Davis reported "feeling fine and not feeling tired."  (R. 518.)  His systolic blood pressure was normal and the examination was otherwise unremarkable.  (R. 518-20.)

On June 11, 2011, Davis returned to Advocate Christ Medical Center, complaining of headaches, nausea and vomiting.  (R. 545.)  Dr. Abid Ali performed a neurology consultation and recommended an MRI or CT scan.  (R. 570.)  The record indicates that Davis complained of headaches starting gradually and then worsening overnight.  (R. 546.)  This was followed by feelings of dizziness, several episodes of vomiting and blurred vision.  (*Id.*)  He underwent a CT scan of his head and the

impression was "normal noninfused CT of brain."  (R. 561.)  Additionally, an MRI of his brain showed "no acute intracranial abnormality."  (R. 563.)

Physical Residual Functional Capacity Assessment

On June 22, 2009, Dr. Vidya Madala conducted an internal medicine consultative examination of Davis.  (R. 477.)  At this exam, Davis stated he was feeling 50% better than he had in November of 2008 when he was admitted to the hospital for heart failure and blood clots in his heart and lungs.  (*Id.*)  Dr. Madala noted that Davis has exertional dyspnea on walking two to three blocks, lifting and carrying anything more than five pounds, or climbing up a couple of steps.  (*Id.*)  She also noted that "he seems to be tired all the time" and "occasionally his medications make him dizzy and lightheaded."  (*Id.*)  Davis had no complaints of chest pain, dyspnea at rest, orthopnea, palpitations, pedal edema, chronic cough or GI bleeding.  (*Id.*)  After a physical exam, Dr. Madala concluded that Davis's diastolic blood pressure was moderately elevated, there was no acute cardiopulmonary distress, his lungs were clear, there were no issues with his joints or with hand dexterity, and the neurological and abdominal examinations were negative.  (*Id.*)

Dr. Madala summarized the physical residual functional capacity assessment of Davis as follows:  "Claimant's statements are viewed as credible as far as the complaints are based on existing conditions but partially credible regarding his need for a cane and his [complaints of] problems lifting, squatting, bending, standing and stair climbing. The claimant's description of the severity of his daily functioning is just not borne out by the most current medical findings."  (R. 487.)

Internal Medicine Consultative Examination

On June 22, 2009, Dr. M.S. Patil examined Davis.  (R. 477.)  Dr. Patil noted that Davis's chief complaints were exertional dyspnea on walking two to three blocks, lifting and carrying anything weighing more than five pounds, and climbing a couple of steps. (*Id.*)  Dr. Patil also noted that Davis told him he seemed to be tired all the time and occasionally his medications make him dizzy and light-headed.  (*Id.*)  Dr. Patil reported no edema or calf tenderness, fine and gross manipulative movements of the hands and fingers were within normal limits and Davis's joints had full range of motion.  (R. 478-479.)

### C. Claimant's Testimony

Davis testified before the ALJ on November 3, 2010.  (R. 9.)  At the time of the hearing, he was 51 years old, 6'1" tall and weighed about 250 pounds.  (R. 14, 16.) Davis is a high school graduate with no other formal education.  (R. 15-16.)  Davis lives at home with his wife and 23-year-old daughter.  (*Id.*)  At the time of the hearing, Davis had no source of income and did not receive any type of payment on a regular basis (such as disability, insurance, workers compensation, retirement).  (*Id.*)  He did not file a worker's compensation claim as a result of any injuries or illnesses.  (*Id.*)

Davis explained that he has not been employed since February 9, 2007.  (R. 17.) His employment was terminated on that date because he failed a physical due to his blood pressure being too high.  (*Id.*)  He was not granted any unemployment benefits or sick leave.  (R. 19.)  At that time, he was working as a ramp attendant for an airline, loading and unloading luggage from airplanes to a conveyer belt.  (*Id.*)  He had worked for three different airlines.  (*Id.*)  While employed, his job performance got to a point where he could no longer lift heavy baggage over his head.  (R. 27-28.)  Prior to

working for the airlines, he had been a shipping clerk for two different companies, packing items, loading items onto trucks, using a forklift and handling paperwork. (R. 20-25.) This was primarily a sedentary job. (R. 25.) He stated that after he was terminated from the airline, he looked for other work but did not find anything. (*Id.*)

Davis testified that he was admitted to Christ Hospital on November 7, 2008, due to shortness of breath, feeling off balance and having trouble walking upright. (R. 30-31.) He used a cane before and after his admission to Christ Hospital because he was having difficulty walking. (R. 31.) The only time he does not use the cane is when he is at home and can lean or grab onto walls to help him balance. (*Id.*) At the time of his hospitalization, he suffered from high blood pressure, as well as a blood clot and he was prescribed an anti-caogulant medication. (R. 31-32.)

Davis testified about his medication and medication schedule. (R. 33-34.) At the time of the hearing, Davis testified that he was taking Aspirin, Coreg, Digoxin, Lasix, Hydralazine, Lisinopril, and Coumadin. (R. 33.) He takes a series of pills at 9:00 a.m. every morning which give him the most side effects. (R. 34.) Davis stated that these medications can make him feel loopy or light-headed, so he typically has to lay down and take a rest for three to four hours. (R. 34-35.) His doctor told him to take them with food, but this does not seem to help. (R. 35-36.) In addition to these pills, he takes other medications at 2:30 p.m., 5:30 p.m. and 9:00 p.m. (R. 37.) Davis has continued this regimen since November of 2008. (*Id.*)

In a typical day, Davis is resting until about noon. (R. 37.) He does not drive because he does not have a car; instead, he uses public transportation to get around. (*Id.*) Most of the household chores are left to his wife and daughter. (*Id.*) He usually

passes the time by watching television.  (R. 39.)  If he accompanies his wife when grocery shopping, he just takes a seat and observes because he is a little bit tired and he does not enjoy grocery shopping.  (*Id.*)  He can walk about three or four blocks before getting winded.  (R. 40.)  Davis testified that his activity is limited because stress elevates his blood pressure.  (R. 43.)  He can only lift about twenty pounds before feeling a strain.  (R. 42.)  In addition, he is able to dress and undress himself, he can bathe on his own, he has no difficulty reaching, buttoning, tying, or zipping things and he can open jars or screw something without any problem.  (R. 40-43.)  He also has no difficulty sleeping.  (R. 44.)

Davis stated that he has to prop up his right leg "basically all the time" when he is sitting.  (R. 44.)  He testified that if he does not elevate his leg he feels a "funny sensation."  (R. 46.)  He believes that the clots may have originated from the right leg. (*Id.*)  Davis is able to sit for approximately sixty minutes before he needs to get up and stretch due to restlessness.  (R. 49.)  He can walk three or four blocks but he tires easily.  (R. 46.)  He stated "there's no way" he could stand and walk six out of eight hours in a work day.  (R. 50.)

### D.  Medical Expert Testimony

Medical Expert John Cavenagh (the "ME") also testified at the hearing.  (R. 51-59.)  The ME testified that during a hospital stay in November of 2008, Davis had several tests including coronary angios and echocardiograms.  (R. 53.)  The ME stated that the angios were negative for coronary disease and the echo showed a patent foramane ovale.  (*Id.*)  The ME explained that a patent foramen ovale is when there is a hole between the right and left atrium.  (*Id.*)  The ME also stated that Davis had a clot in

the right atrium.  (*Id.*)  This clot had gone into the right side of the heart and went into and broke up in the lungs. (R. 53-54.)

The ME further testified that he heard the testimony regarding the problems with Davis's right leg, but stated that he did not see this issue addressed in Davis's medical records.  (R. 54.)  The ME stated the most common cause of pulmonary emboli is deep vein thrombosis in the legs, but that was also not referenced in the records.  (R. 54.) The ME further explained that "sometimes the clot in the right atrium can break off, go through the opening there between the atrium into the left atrium and then go out to the brain or other parts of the body."  (R. 55.)  In this case, he stated there was no evidence of that process occurring.  (*Id.*)  The ME testified that Davis's congestive heart failure responded to medications, and the atrial thrombus cleared with anticoagulant therapy, with no systemic embolization through the patent foramen ovale.  (R. 55.)

The ME also stated that at the time of the hearing, without a more recent echocardiogram, he did not know if Davis's ejection fraction was normal or if the heart was performing the way it should.  (R. 56.)  Additionally, without a more recent echocardiogram, the ME testified that he was unable to form an opinion as to whether a listing was met or what Davis's RFC would be.  (R. 57.)  When asked by Davis's attorney whether he would advise Davis to elevate his leg, the ME testified that he would need to discuss it with the patient, and that in this case, he did not have enough information to say whether or not he would recommend the patient to elevate his leg. (*Id.*)

After the hearing, the ME obtained a more recent echocardiogram from July 17, 2009.  (R. 535.)  Upon reviewing these records, the ME opined that Davis did not meet

Listing 4.02. (*Id.*) The ME also found that one could "reasonably limit claimant to a light level of activity, lifting 20 pounds occasionally, 10 pounds frequently, standing and walking 6 hours out of 8, climbing stairs occasionally, avoiding ladders and scaffolding and temperature extremes, with occasional stooping, squatting, crouching and no crawling." (R. 536.)

### E. Vocational Expert Testimony

Vocational Expert Edward Stephan (the "VE") also testified at the November 3, 2010 hearing. (R. 59-70.) The ALJ asked the VE to classify Davis's past work. (R. 61-62.) The VE stated that claimant's activity would go into two job categories. (R. 62.) The first is a ramp agent, which the Dictionary of Occupation Titles (the "DOT") describes as medium and semi-skilled. (R. 62-63.) The second category is shipping and receiving clerk, which is defined by the DOT as medium and semi-skilled. (R. 63.) The VE testified that the skills of a shipping and receiving clerk would be weighing, labeling, routing, and inventory control. (R. 63.) The VE stated that the baggage checker does not have any transferable skills to other occupations. (*Id.*) However, the VE testified that the skills of a shipping and receiving clerk are transferable to light or sedentary level jobs. (R. 64.)

The ALJ then recited Davis's qualifications to the VE and asked if there would be light sedentary shipping and receiving positions available; the VE stated that for such an individual, in the surrounding area, he estimated 7,000 sedentary light duty positions and 12,000 sedentary medium duty positions were available. (*Id.*) The VE also explained that if such an individual required the use of a cane and was limited to sedentary work it would not erode any of the job numbers listed above. (*Id.*) The VE

stated there would not be any work for anyone at any exertional level if that person had to take an unscheduled break an hour a day. (R. 66.) In the VE's opinion, an individual that needed to elevate one leg above waist level while sitting would not be able to work. (R. 68.) The ALJ asked the VE whether Davis met a Listing and the VE testified that he could not make that determination based on the record. (R. 57.) Similarly, the VE testified that he could not formulate an opinion about Davis's RFC without more information. (*Id.*)

## II. LEGAL ANALYSIS

### A. Standard of Review

Judicial review of the Commissioner's final decision is authorized by Section 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). When reviewing this decision, the court may not engage in its own analysis of whether the claimant is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). We must affirm the ALJ's decision if it is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842). In addition, "the ALJ must explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Mladucky v. Colvin*, No. 13 C 5324, 2014 WL 3584326, at *2 (N.D. Ill. July 24, 2014).

Moreover, "although the Court affords great deference to the ALJ's determination, it must do more than merely rubber stamp the ALJ's decision." *Id.* "The Court must critically review the ALJ's decision to ensure that the ALJ has built an accurate and logical bridge from the evidence to his conclusion." *Id.* In addition, we must consider the entire administrative record, but we will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (quoting *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). We will "conduct a critical review of the evidence" and we will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Clifford*, 227 F.3d at 869. The ALJ must "sufficiently articulate [her] assessment of the evidence to 'assure us that the ALJ considered the important evidence…[and to enable] us to trace the path of the ALJ's reasoning.'" *Carlson v. Shalala*, 999 F.3d 180, 181 (7th Cir. 1993) (per curiam) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

## B. Analysis under the Social Security Act

Whether a claimant qualifies to receive disability insurance benefits rests on a determination of whether the claimant is disabled under the Social Security Act. A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: (1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's

impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether she can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

In this case, the ALJ followed the five-step analysis denying Davis's request for benefits. (R. 84.) At step one, the ALJ found that Davis had not engaged in substantial gainful activity during the period from his alleged onset date of November 6, 2008. (R. 78.) At step two, the ALJ determined that Davis had the following severe impairments: history of congestive heart failure, resolved; cardiomyopathy; hypertension; moderate obesity; and a patent foramen ovale. (*Id.*) At step three, the ALJ found that Davis did not have an impairment or combination of impairments that meets or medically equals the listed impairments set out in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526). The ALJ came to this conclusion because "the record contains no medically documented presence of either systolic or diastolic failure with the requisite left ventricular dimension or ejection fraction measurements during a period of stability." (R. 78-79.) Moreover, the ALJ stated that Davis's impairments did not result in the symptoms required to meet Listing 4.02(B). (R. 79.) Lastly, the ALJ found that Davis's hypertension does not meet a listing because it has not resulted in any end organ damage. (*Id.*)

At step four, the ALJ examined Davis's residual functional capacity ("RFC") to determine whether he could perform his past relevant work. (R. 79-83.) The ALJ found that "claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that he: can only occasionally stoop, squat, crouch, or climb ramps or stairs." (R. 79.) The ALJ also found that the claimant "can never crawl or climb ladders, ropes or scaffolds; and must avoid exposure to temperature extremes." (*Id.*) The ALJ ultimately concluded that Davis's complaints regarding the intensity, persistence and limiting effects of his alleged symptoms are not credible in that they are inconsistent with the RFC assessment. (*Id.*) The ALJ also stated that the objective evidence established Davis's impairments but it does not support his contention of disability. (*Id.*)

The ALJ concluded that when comparing Davis's RFC with the physical and mental demands of his previous work, he was capable of performing past relevant work as a shipping and receiving clerk at the light and sedentary levels. (R. 83.) At step five, the ALJ relied on the testimony of the VE to determine that Davis's skills from his past relevant work would transfer to other shipping and receiving positions at those exertional levels. (*Id.*) Therefore, the ALJ found that Davis was not entitled to disability insurance benefits.

Davis now argues that: (1) the ALJ improperly assessed his credibility; (2) the ALJ improperly assessed his RFC; and (3) the ALJ failed to include all his findings in his hypothetical questions to the VE. We will address each of Davis's arguments in turn.

### C. The ALJ's Credibility Finding Was Based on a Misstatement of the Record.

Davis first argues that the ALJ's credibility determination is flawed and requires remand for several reasons. An ALJ's credibility determination may be overturned only if it is "patently wrong." *Pepper v. Colvin*, 712 F.3d 351, 366 (7th Cir. 2013); *Craft*, 539 F.3d 668, 678 (7th Cir. 2008). An ALJ's credibility assessment is afforded special deference because the ALJ is in the best position to see and hear the witness and determine credibility. *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). At the same time, the ALJ must adequately explain his credibility finding by discussing specific reasons supported by the record. *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009).

Davis has several arguments regarding the ALJ's credibility analysis. First, he claims that the ALJ's decision is inadequate because the ALJ used boilerplate language in his opinion. The ALJ stated in part:

> "…the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above functional capacity assessment." (R. 79.)

Claimant correctly notes that the Seventh Circuit has repeatedly described this language as "meaningless boilerplate" because it fails to link the ALJ's conclusions with objective evidence in the record. *Pepper*, 712 F.3d at 367. In other words, the boilerplate language does not adequately explain to a reviewing court what the ALJ relied on when making his determination. *Id.*; *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010).

However, the Seventh Circuit has also noted that even when the ALJ uses this boilerplate language, his decision is not necessarily wrong so long as he otherwise supports his credibility determination with sufficient evidence in the record. *Pepper*, 712

F.3d at 368; *Shideler v. Astrue*, 688 F.3d 306, 311-12 (7th Cir. 2012); *see also Getch v. Astrue,* 539 F.3d 473, 483 (7th Cir. 2008). Here, the ALJ did cite to medical evidence in the record in support of his credibility findings. After the boilerplate language, the ALJ's decision includes several paragraphs discussing Davis's medical records and testimony. (R. 79-83.) These paragraphs offer considerable detail and analysis, comparing claimant's medical history and medical records with the claimant's testimony and several medical opinions. (R. 79-83.) For these reasons, the ALJ's use of boilerplate language does not require remand.

Next, Davis argues that the ALJ's credibility analysis is flawed because he mischaracterized evidence in the record. At the hearing, Davis testified that he suffers from fatigue as a side effect of the numerous medications he takes each morning. He stated that as a result of these medications, he feels loopy and light-headed and needs to sleep for a few hours. The ALJ discredited this testimony because, he opined, it was not supported by objective medical evidence in the record. The ALJ stated that despite his testimony complaining of fatigue, "the claimant's treatment notes indicate no such drowsiness," and that after November of 2008, "he made no complaints of fatigue to either his physician or his cardiologist." (R. 82.) The ALJ stated that "[t]he only time the claimant reported fatigue and medication-induced dizziness was at the consultative examination." (*Id.*)

We agree with Davis that the ALJ has misstated the record here. As Davis correctly points out, a record dated January 23, 2009 from Advocate Health Center notes that Davis reported to Dr. Taylor that he had been feeling "out of sorts" after taking his morning medications (R. 377); similarly, a record dated February 3, 2009

notes that Davis was "feeling tired after taking his morning meds." (R. 379.) Therefore, the ALJ was not accurate when he stated that Davis had never complained of fatigue to his physicians. The deference we afford to an ALJ's credibility determination is "lessened… where the ALJ's findings rest on an error of fact or logic." *Thomas v. Colvin,* 745 F.3d 802, 806 (7th Cir. 2014). Because the ALJ relied on this misstatement of the evidence in making his credibility determination, we find that remand here is warranted. *Thomas,* 745 F.3d at 806 (remanding where the ALJ ignored medical evidence that supported claimant's complaints of pain).

The Commissioner argues that despite this misstatement, the ALJ's decision should be affirmed because on two occasions subsequent to his complaints about fatigue, Davis actually denied experiencing any fatigue or other side effects from his medications. While this is true, it does not rectify the fact that the ALJ ignored relevant evidence in discrediting Davis's testimony regarding fatigue. *See, e.g., Smith Moore vs. Colvin,* No. 14 C 0922 2015 WL 5920875, at *8 (N.D. Ill. Oct. 8, 2015) (remand was necessary where the ALJ disregarded claimant's complaints of pain based on "a few isolated denials of pain" in the record). "An ALJ need not mention every piece of medical evidence in her opinion, but she cannot ignore a line of evidence contrary to her conclusion." *Thomas,* 745 F.3d at 806. Because the ALJ misstated or overlooked relevant evidence in the record, it is impossible for us to determine whether he considered the entire record in making his determination, and this requires a remand. *Voight v. Astrue*, No. 10 C 7847, 2011 WL 6156841, at *10-12 (N.D. Ill. Dec. 12, 2011) (finding that the ALJ's "misstatements raise legitimate questions as to how thoroughly the ALJ evaluated the record"); *Lopez v. Barnhart*, 336 F.3d 535, 540 (7th Cir. 2003)

(remand required where the ALJ ignored available evidence supporting claimant's allegations of pain).

Davis also argues that the ALJ improperly discredited his complaint that he needs to elevate his leg for a significant amount of time. Like Davis's complaints about fatigue, the ALJ disregarded this testimony because it was not supported by the record. The ALJ stated that there was no discussion in any of the medical records of Davis discussing this limitation with his doctor. This time, we find that the Commissioner is correct that there is no evidence in the record to support claimant's complaint about the need to routinely elevate his leg. Nevertheless, because we have already determined that the ALJ overlooked other relevant evidence, on remand, the ALJ should carefully review all the medical evidence in the record before making any credibility determinations.

### D. Claimant's Remaining Arguments Should Be Reexamined on Remand

Because we have already determined that a remand is required, we will only briefly discuss Davis's remaining arguments.

#### 1. RFC Analysis

Next, Davis argues that the ALJ erred in making his RFC determination that Davis can perform light work. Davis asserts that the ALJ's RFC analysis was wrong because he failed to consider the combined effects of his symptoms. These symptoms include: congestive heart failure, cardiomyopathy, obesity, dizziness, fatigue, and the need to elevate his leg. Davis argues that the ALJ failed to comply with SSR 96-8p because he failed to consider in combination Davis's impairments, which were ruled

singly non-severe.  Davis asserts that had the ALJ considered his symptoms in combination, he would have reached a different RFC.

We disagree.  Pursuant to SSR 96-8p, "the RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g. daily activities and observations)."  SSR 96-8p.  In making his RFC determination, the ALJ considered and addressed medical records from Davis's treating physicians, medical opinions from state agency physicians and the medical expert, and the observations of claimant's wife.  (R. 82.)  The state agency physicians opined that Davis could perform work at the light exertional level.  (*Id.*)  The ALJ gave these opinions significant weight because the ALJ found that the objective evidence in the record supported this conclusion and because no treating source had provided an opinion that contradicted this conclusion.  (*Id.*)  Next, the ALJ explained that he gave Dr. Cavenagh's opinion great weight because he is a cardiologist and had the benefit of all of Davis's medical records when he formed his opinion.  (R. 82.)  Also, no treating sources contradicted Dr. Cavenagh.  (*Id.*)  Additionally, the ALJ noted that he gave modest weight to Mrs. Davis's observations because some of her observations could be biased and because the medical evidence did not support her contention that Davis needs a cane.  (R. 83.)  Therefore, we find that the ALJ sufficiently articulated his reasoning for adopting the RFC analysis that Davis could perform light work.

In addition, Davis argues that because the ALJ got the credibility analysis wrong, he failed to consider the effect that Davis's fatigue would have on his RFC determination.  As we have stated above, we agree that remand is necessary on the

issue of the credibility of Davis's complaints about fatigue. Therefore, on remand, the ALJ will be required to reconsider Davis's testimony regarding his fatigue and whether it impacts the RFC determination.

## 2. Hypothetical Question to the Vocational Expert

Finally, Davis contends that the ALJ failed to include all the limitations he found in his hypothetical questions to the VE. Generally, the hypothetical question the ALJ poses to the VE must fully set forth the claimant's impairments to the extent that they are supported by the medical evidence in the record. *Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir. 2004). However, the question posed to a VE does not need to include every limitation of the claimant, provided that the VE had the opportunity to learn of the claimant's limitations through an independent review of the medical records or through other questioning at the hearing. *Id.*

Here, Davis argues that the ALJ framed his hypothetical question to the VE without referring to all of Davis's complaints and non-exertional impairments (dizziness, lightheadedness, fatigue, and drowsiness). However, the VE had reviewed the medical evidence prior to the hearing and was present throughout the hearing. (R. 59.) The VE even testified that based on the information he had at the time of the hearing, he was not able to formulate an opinion in response to some of the ALJ's questions. (R. 57.) Therefore, because the VE had reviewed the record and he was present during Davis's testimony, the Court is permitted to conclude that the VE considered Davis's various impairments even though all of those impairments were not specifically included in the ALJ's hypothetical question. *Ragsdale v. Shalala*, 53 F.3d 816, 818 (7th Cir. 1995); *see Ehrhart v. Secretary*, 969 F.2d 534 (7th Cir. 1992). Accordingly, the ALJ's omission of

the non-exertional limitations was harmless. Nevertheless, because we have already determined that the case must be remanded to the ALJ for further proceedings, the ALJ should include all relevant limitations in the questions to the VE at the hearing after remand.

## III. CONCLUSION

For the reasons set forth above, Davis's motion for summary judgment is granted and the Commissioner's cross-motion for summary judgment is denied. It is so ordered.


**ENTERED:**

**Dated: October 29, 2015**

**The Honorable Michael T. Mason**
**United States Magistrate Judge**